UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTRESS CLOSEOUT
CENTER IV, LLC,

               Plaintiff,               No. 14-cv-12562

vs.                                 Hon. Gerald E. Rosen

PANERA, LLC,

               Defendant.
_____/

OPINION AND ORDER REGARDING THE PARTIES'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on July 15, 2016

PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I.  INTRODUCTION

Plaintiff Mattress Closeout Center IV, LLC ("MCC") and Defendant Panera, LLC ("Panera") are neighboring businesses in Rochester Hills, Michigan.  In April 2013, a water leak from a pipe in Panera's kitchen started to drain into the shared wall between the restaurant and MCC causing damage to MCC's showroom.  In a two-count negligence and nuisance complaint, MCC seeks damages in excess of $100,000.00, plus attorney's fees and costs.  The parties now each move for partial summary judgment:

1

MCC moves for summary judgment in its favor and against Panera as to liability; Panera seeks summary judgment on Plaintiff's claims for lost future profits, attorney fees, employees' lost time and exemplary damages. Responses and reply briefs have been filed.

Having reviewed and considered the parties' motions, briefs, supporting evidence, and the entire record of this matter, the Court has concluded that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

MCC is a local, Michigan business that sells mattresses and accessories to consumers at fifty to seventy percent less than the competition. In the words of MCC's owner, Gregory Yatooma, "MCC is like the Marshalls or TJ Maxx of the mattress world." [*See* Yatooma 5/6/15 Affidavit, Plaintiff's Ex. C, Dkt. # 32-4, ¶¶ 5-8.] MCC currently operates out of four locations: Bloomfield Hills, Rochester Hills, Wixom and Westland. *Id.* While the Wixom and Westland locations are warehouses that are open to the public, the Bloomfield and Rochester Hills locations are full retail stores where consumers can browse and experience MCC's high-end products, lay on mattresses while watching one of the several 60" televisions in the store, enjoy complimentary soft drinks or coffee, or play foosball on the coffee table while they finalize a transaction. *Id.* at ¶ 8.

2

Panera is one of the nations leading restaurant brands.  According to its website, as of December 31, 2013, Panera operated 1,777 bakery-cafés in 45 states and Ontario, Canada.  [Complaint, ¶ 13.]

In April 2013, MCC's staff noticed water leaking through the wall adjoining MCC's and Panera's stores.  [Yatooma Aff., ¶¶ 9-12.] The issue was immediately reported by an MCC manager to both Panera and MCC's and Panera's landlord, Brixmor.  *Id.* at ¶¶ 14-16.  However, according to MCC, Panera ignored the issue. *Id.* at 16.

According to MCC, over the next several months, MCC continually alerted Panera and Brixmor that the water leak was causing significant damage to its showroom wall and floor.  *Id.* at ¶ 25.  MCC alleges that it was not until July 24, 2013 -- over three months after the first report of the water intrusion, and numerous pleas from MCC for Panera to fix the leak -- that Ray Schulte, Panera's facilities manager, visited the property to investigate.  *Id.* at ¶¶ 28-29.  Schulte hired a plumber who discerned that the water leak was coming from pressure buildup in the water line above Panera's water heater, and a water hammer had caused the line to come loose causing a constant flow of water into MCC's store.  [Schulte Dep., Plaintiff's Ex. B, p. 8.]

In August, Panera hired a contractor to repair the damage.  Panera paid for the cost to have the leak alleviated, and paid for all repairs to the MCC's showroom.  MCC admits no damage to inventory, and has expended no out of pocket funds for repairs.

3

[*See* Answers to Request to Admit Nos. 1, 4 and 6, Dkt. # 36-7.]  Remediation work, including a full battery of tests to ensure that any mold had been removed, concluded in December 2013, eight months after the leak was first reported to Panera.

Meanwhile, beginning in October 2013, MCC tried to resolve the issue of restitution with Panera.  Specifically, MCC requested restitution in the form of compensation from Panera for 1) loss of business income; 2) repayment of lost employee time; 3) repayment of Yatooma's time "as the principal for MCC"; and 4) loss of future income.  [*See* Yatooma Aff. , ¶¶ 34-36; *see also* Report of Plaintiff's Expert John Zerbo, Plaintiff's Ex. B.][1]  As more fully described in Plaintiff's Expert Report, these categories of damages include the following:

> 1)  <u>Loss of business income</u> -- Lost profits as a result of the impact of the water damage to the showroom and customer environment during the damage period April 2013 to August 2013;
>
> 2)  <u>Lost Employee Time</u> -- $2,404.75 for the 120+ hours of time MCC employees spent in having to displace inventory throughout the showroom, handling customer complaints, and dealing with remediation vendors;

---

[1]  The Court references the Zerbo report only for the description of the categories of damages sought by Plaintiff.  The Magistrate Judge ordered stricken all information and documents relating to MCC's Bloomfield Hills store's financial or sales information referenced or utilized in MCC's expert report and in the deposition of MCC's expert, and no objections to the Magistrate Judge's Order were ever filed. *See* 3/18/16 Opinion and Order, Dkt. # 69. (The Magistrate Judge ordered that MCC could have 30 days from the date of his Order (i.e., until April 18, 2016) to produce a supplemental expert report that uses only the financial data from its Rochester Hills store to compute damages, however, no such supplemental report was ever filed and the time for doing so has now expired.) Accordingly, the Court disregards any calculation in the report made based upon comparisons of financial or sales information between MCC's Bloomfield and Rochester Hills stores as to the amounts of Plaintiff's claimed damages.

3)  Lost Principal's Time -- for the "well over 150 hours" of time Gregory Yatooma spent dealing with the damage, customer complaints, remediation vendors, Panera Management, Panera insurance adjustors, and counsel. Plaintiff calculates the amount of compensation for this time both based on Yatooma's average $275/hr. billing rate in his law practice ($41,250), and based on a $261/hr. calculation of his average earnings feom the estimated 1,000 hours per year he devotes to his various mattress locations ($39,150).

4.  Lost Future Income -- based on a projection of anticipated lost repeat/referral business for the five years, 2015-2019.

[*See* Plaintiff's Ex. B.]

According to Gregory Yatooma, Ray Schulte assured him that he would handle MCC's request for restitution.  Schulte forwarded MCC's request to Panera's corporate headquarters.  In January 2014, Panera got its insurance company, Travelers Insurance, involved, but, according to Plaintiff, the insurer failed to make any meaningful effort to compensate MCC for its claimed business interruption.  When by April 2014 settlement attempts failed and no more than a "disingenuous offer of restitution" was made by Panera, [Yatooma Aff., ¶ 51], MCC instituted this lawsuit in Oakland County Circuit Court on May 19, 2014.  Panera timely removed the case to this Court on diversity of citizenship grounds.

In its two-count Complaint, MCC alleges claims of negligence and nuisance, seeking to recover "out-of-pocket, incidental and consequential damages in excess of $100,000.00," and "exemplary damages" in the amount of $50.000.00, "[b]ased on Panera's selfish and obnoxious conduct" and "repeated attempts at delay and its harassment of MCC," plus attorney's fees and costs.  [Compl., ¶¶ 88-90; 96-97.]

5

## III.  DISCUSSION

A.    APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).  The Court will apply the foregoing standards in

deciding the parties' motions for summary judgment in this case.

**B.     PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY WILL BE GRANTED, IN PART, AND DENIED, IN PART.**

The Court will first address Plaintiff's Motion for partial summary judgment as to the issue of liability.  As an initial matter, the Court notes that Defendant Panera has neither opposed, nor otherwise responded to, Plaintiff's request for summary judgment as to Defendant's liability on MCC's nuisance claim.

One is subject to liability for a private nuisance if

(a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm, (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct.

*Capital Properties Group, LLC v. 1247 Ctr. Street, LLC*, 283 Mich. App. 422, 429, 770 N.W. 2d 105, 111 (2009) (quoting *Cloverleaf Car Co. v. Phillips Petroleum Co*., 213 Mich. App. 186, 193, 540 N.W.2d 297, 301-302 (1995)).

Without opposition, Plaintiff's motion for partial summary judgment of liability will be granted on this claim.

Further, Defendant does not contest liability for general negligence.  [*See* Defendant's Response Brief, Dkt. # 49.]  The requisite elements of a negligence cause of action are that the defendant owed a legal duty to the plaintiff, that the defendant breached or violated the legal duty, that the plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered.  *Schultz v. Consumers Power Co*.,

443 Mich. 445, 449, 506 N.W.2d 175, 177 (1993) (quoting *Roulo v. Automobile Club of Michigan*, 386 Mich. 324, 192 N.W.2d 237 (1971).

Defendant does, however, dispute that there is any basis for any claim of gross negligence, intentional, or willful or wanton conduct against it.  The Court agrees.

First of all, Plaintiff did not plead "gross negligence" or "willful or wanton" conduct in its Complaint.  Citing a Section 1983 Fourth Amendment excessive force case, *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), Plaintiff argues that it was unnecessary for it to plead gross negligence because no independent cause of action for gross negligence is recognized under Michigan law.[2]  Plaintiff is mistaken.  Quite the

---

[2]  In *Bletz*, the Sixth Circuit was construing Michigan's Governmental Immunity statute, M.C.L. § 691.1407, which provides, in relevant part, that an officer or employee of a governmental agency is immune from tort liability "if the officer's or employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage," M.C.L. § 691.1407(2)(c), and held that the requirement of establishing "gross negligence" for purposes of avoiding governmental immunity did not create an independent cause of action:

> In Count I of her amended complaint, plaintiff claims that defendants' alleged use of excessive force constituted gross negligence, which is actionable under Mich. Comp. Laws § 691.1407. Although establishing that a governmental official's conduct amounted to "gross negligence" is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available to plaintiff for allegations of this nature would be for assault and battery. *See, e.g., Van Vorous v. Burmeister*, 262 Mich.App. 467, 687 N.W.2d 132, 143 (2004) ("Thus, plaintiff's claim of gross negligence is fully premised on her claim of excessive force. As defendants correctly note, this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence. Thus, plaintiff did not state a claim on which relief could be granted.") (citations omitted); *see also Livermore* [*v. Lubelan*], 476 F.3d [397,] 408 [(6th Cir. 2007)] (rejecting gross-negligence claim against an officer-defendant because it was "undoubtedly premised on the intentional tort of

contrary, Michigan courts have long recognized "gross negligence" or "willful or wanton

misconduct" as distinct causes of action from that of "ordinary negligence."

In *McKeever v. Galesburg Speedway, Inc.*, 57 Mich. App. 59, 62, 225 N.W.2d

184, 186 (1974), the Michigan Court of Appeals observed:

> [I]t is clear that Michigan recognizes a separate doctrine of "gross
> negligence."  According to *Denman v. Johnston*, 85 Mich. 387, 396, 48
> N.W. 565, 567 (1891), gross negligence:
>
> > "* * * means an intentional failure to perform a manifest duty
> > in reckless disregard of the consequences as affecting the life
> > or property of another.  It also implies a thoughtless disregard
> > of consequences, without the exertion of any effort to avoid
> > them."
>
> While gross negligence is not viewed as a higher degree of negligence, it
> does include the factors of ordinary negligence plus "a willful and wanton
> disregard for public safety."

*McKeever*, 57 Mich. App. at 62, 225 N.W.2d at 186 (quoting *Wieczorek v. Merskin*, 308

Mich. 145, 149, 13 N.W.2d 239, 240 (1944)).  *See also Maiden v. Rozwood*, 461 Mich.

109, 122-23, 597 N.W.2d 817, 823 (1999) (emphasizing that evidence of ordinary

negligence does not establish a question of fact concerning gross negligence:  "Rather a

plaintiff must adduce conduct 'so reckless as to demonstrate a substantial lack of concern

for whether injury results.'" *Id.*)

---

battery" where it was based on a shooting that resulted in death). Therefore, the
district court erred in not dismissing plaintiff's state-law gross-negligence claim.
As a result, we reverse the district court's decision to deny summary judgment on
this claim.

641 F.3d at 756.

9

Plaintiff's allegations of a delay in answering Plaintiff's claims for restitution or that Panera's actions were "selfish" and "obnoxious" do not rise to the level of actionable gross negligence or willful or wanton misconduct cognizable under Michigan law.  As the Michigan Supreme Court observed in *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985) (in the context of an analogous claim for intentional infliction of emotional distress),

> [A] delay of at most six months in responding to the claim as filed, and the denial of benefits owed . . . falls far short of the conduct which is considered tortiously outrageous. There is no indication that Auto-Owners set out to harass these plaintiffs, nor does the evidence disclose a course of conduct that may fairly be characterized as so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.*, 422 Mich. at 607-08, 374 N.W.2d at 910 (citations and some internal punctuation omitted).

For all of the foregoing reasons, the Court will GRANT Plaintiff's Motion for Summary Judgment on Liability, in part, only on Plaintiff's claim of ordinary negligence (Count I) and nuisance (Count II).  In all other respects, Plaintiff's Motion for Summary Judgment on Liability is DENIED.


C.      DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court next turns to Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for damages.  Defendant argues that Plaintiff's claims for exemplary

10

damages have no legal basis and should, therefore, be dismissed; that Plaintiff's claims for lost employees' time and lost principal's time should be dismissed as there were no cost incurred by Plaintiff for such alleged lost time; and that Plaintiff's claims for lost future profits should be barred as they are based on nothing more than speculation and conjecture.

1.      Exemplary Damages

In Michigan, exemplary damages are recoverable as compensation to the plaintiff, not as punishment of the defendant. *Kewin v. Massachusetts Life Ins. Co.*, 409 Mich. 401, 419, 295 N.W.2d 50, 55 (1980). "An award of exemplary damages is considered proper if it compensates a plaintiff for the 'humiliation, sense of outrage, and indignity' resulting from injuries 'maliciously, wilfully and wantonly' inflicted by the defendant." *Id.* (quoting *McFadden v. Tate*, 350 Mich. 84, 89, 85 N.W.2d 181, 184 (1957). The theory is that "the reprehensibility of the defendant's conduct both intensifies the injury and justifies the award of exemplary damages as compensation for the harm done the plaintiff's feelings." *Id.*

A litigant's status as a business entity does not *per se* preclude an award of exemplary damages. *Unibar Maint. Services, Inc v. Saigh*, 283 Mich. App. 609, 630; 769 N.W.2d 911, 923-24 (2009). A corporation, however, does not have "feelings." *Id.* at 631. Therefore, it cannot suffer "humiliation, sense of outrage and indignity" which are the types of injuries for which exemplary damages are meant to compensate.

11

Accordingly, exemplary damages may be awarded to business entities in limited circumstances.

Given the purpose of compensatory damages, which is to make the plaintiff whole, *Hayes-Albion Corp. v. Kuberski*, 421 Mich. 170, 187, 364 N.W.2d 609 (1984), the Michigan Court of Appeals has noted that exemplary damages may be appropriate for injuries to a corporation that cannot be measured or estimated in monetary terms. *Unibar*, *supra,* 283 Mich. App. at 631.  Where, however, "the grievance created is purely pecuniary in its nature, and is susceptible of a full and definite money compensation," exemplary damages are not permitted.  *Id.* (citations omitted).

On the other hand, loss of a business entity's reputation as a skilled company is unquantifiable; hence, if such loss of reputation or goodwill is established, the company may be entitled to exemplary damages.  *Id.* (citations omitted).  However, "future profits, as well as lost time of [the plaintiff's] employees, do not fit within this category."  *Id.* (citing *Hayes-Albion Corp.*, *supra*, 421 Mich. at 187-188).

In *Unibar,* the court found sufficient evidence of loss of reputation to warrant an award of exemplary damages to the plaintiff company where the plaintiff produced evidence showing that over a period of years, the insurance-agent defendants willfully induced plaintiff to purchase, on multiple occasions, what was essentially a self-funded benefit plan represented as a first-dollar, full-coverage health insurance plan when defendants knew plaintiff sought full coverage insurance. Consequently, plaintiff's

employees' claims for insurance benefits were denied, they were unable to see their health care providers or obtain prescriptions, and in some instances were sued by their health care providers. *Id.* at 632. In addition, plaintiff fielded "hundreds" of complaints from its employees and "a lot" of its employees quit their jobs because of the lack of health benefits. *Id.* Thus, the court concluded that "although plaintiff ha[d] not produced any direct evidence showing that its internal reputation has been damaged, it is plain, given the number of complaints and employees who left their employment with plaintiff, that plaintiff's reputation amongst its employees suffered as the proximate result of defendants' actions. Such injuries are not compensable in quantitative terms and the award of exemplary damages was proper." *Id.*

The same is not true in this case. Here, Plaintiff has presented no such evidence from which loss of reputation or goodwill may be inferred. Plaintiff has presented no hard evidence of any long-term effect on its customers of the damage to its showroom. Indeed, the sales records relied upon and testified to by Plaintiff's expert, John Zerbo, show an *increase* in sales and profits as of the beginning of the year immediately following the damage period (April - August 2013). [Zerbo 3/10/15 Dep., p. 30.] Moreover, all of Plaintiff's claims of lost business are quantifiable and susceptible of monetary compensation. [Zerbo 3/10/15 Dep., pp. 14-20; 29-31.] Therefore, under Michigan law, Plaintiff is not entitled to exemplary damages. Accordingly, Defendant will be granted summary judgment on Plaintiff's exemplary damages claims.

13

2.     Lost Employee Time/Lost Principal's Time

Plaintiff also seeks damages in the amounts of $2,405.00 for 120 hours of "lost employee time" which Plaintiff alleges its employees spent in having to displace inventory throughout the showroom, handling customer complaints and dealing with remediation vendors due to the water leak in its showroom, and $39,150.00 to $41,250.00 as"lost principal's time" for the "well over 150 hours" of time Gregory Yatooma spent dealing with the damage, customer complaints, remediation vendors, Panera Management, Panera insurance adjustors, and counsel. As indicated, Plaintiff calculates the amount of compensation for this time both based on Yatooma's average $275/hr. billing rate in his law practice ($41,250), and based on a $261/hr. calculation of his average earnings from the estimated 1,000 hours per year he devotes to his various mattress locations ($39,150).

With respect to the 120 hours of lost employee time, Mr. Zerbo testified he based the amount of MCC's damages by averaging the hourly rates of pay of the Rochester Hills store's employees, which yielded an average hourly rate of $20.04, and then multiplying that sum by 120 hours. [Zerbo 3/10/15 Dep., p. 44.] Zerbo testified that he got the "120 hours" from Greg Yatooma who told Zerbo employees would have spent approximately 10 hours a week for 12 weeks (i.e., the length of the damage period April - August 2013) "shuffling things around, doing different things." *Id.* However, Zerbo admitted there is no documented evidence supporting the claimed lost time and he did not

14

look at any employee time cards or payroll schedules, and he does not know if any of the

120 hours was in excess of  the employees' regular scheduled working time.  *Id.* at 45-46.

Q:    The 10 hours per week that they spent dedicated to this issue that
       we're talking about today, was that over and above the regularly
       scheduled shift?

\*\*\*

A:    I can't tell you . . . if it was or not.

Q:    Okay.  You just don't know.

A:    But we do know that they spent time remedying the problem.

Q:    Okay.

A:    And we figured about 10 hours a week.

Q:    Well, if this problem didn't exist, would they have been paid the
       same anyway?

A:    I can't -- I can't tell you if they would have or not.

\*\*\*

Q:    As you just told me before, you don't know if that 120 hours was
       over and above their regularly scheduled shift, right?

A:    Right.

Q:    So you can't tell?

A:    I can't tell.

Q:    Okay.

A:    We just estimated what we thought they spent on those problems.

[Zerbo 3/10/15 Dep. pp. 46-47.]

15

Zerbo's calculation of the 150 hours of Yatooma's time spent "as principal of MCC" and the range of $39,150 to $41,250 of damages for this lost time is similarly based on nothing more than suppositions and unsupported estimations.

Zerbo admitted that there is no documentation of payroll or hourly billing sheets showing Yatooma spent 150 hours on the matter. *Id.* at p. 50-51. He testified that he got that number simply by inquiring of Yatooma, and admitted that he used 150 hours because that was what Yatooma told him: "It seemed reasonable. That's what he came up with and I accepted that as being reasonable." *Id.* He further admitted that in arriving at the $275 hourly rate used to calculate the higher damages sum of $41,250, he simply averaged what Yatooma told him he generally billed in his legal practice -- between $250 to $300 per hour -- but Zerbo never reviewed any of Yatooma's bills or invoices to verify those rates. *Id.* at 51.

The methodology used by Zerbo to arrive at the lower damages sum for lost principal time -- $39,150 -- is even sketchier. Zerbo testified that the $261 per hour used to calculate this sum was based on the annual income Yatooma reported for income tax purposes. *Id.* at 50. "We figured at 2,000 yearly that he, you know, a person would put in 40 hours a week. . . [a]nd we split it up [evenly] between his practice and Mattress Closeout," and arrived at 1,000 per year being spent by Greg Yatooma on his Mattress Closeout business. *Id.* Zerbo then calculated the $261 per hour rate by dividing the income reported on his 2013 income tax return by 1,000. *Id.* at 52. The Mattress

16

Closeout income reported on Yatooma's tax return, however, included income derived from *all* of the Mattress Closeout stores, not just the Rochester Hills store. *Id.* at 64. Furthermore, Zerbo admitted there was no documentation showing that Yatooma spent 1,000 hours a year on his mattress business. *Id.*

Zerbo further testified that the 150 hours Yatooma claims he spent on the Rochester Hills water leak issue was not over and above the 1,000 hours, but rather included in that total hour figure, *id.* at 58, and he admitted that no actual cost was incurred by MCC for the 150 hours spent toward the problem. *Id.* at 61.

In Michigan, a plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. *Hofmann v. Auto Club Ins. Ass'n*, 211 Mich.App. 55, 108, 535 N.W.2d 529 (1995). While mathematical precision is not required, there must, at a minimum, be a reasonable basis for computation. *Ensink v. Mecosta Co. Gen. Hosp*., 262 Mich. App. 518, 524-25, 687 N.W.2d 143 (2004). Here, Plaintiff has not shown a reasonable basis for its computation of damages for lost employee time and lost principal's time.

Mr. Zerbo testified there is no evidence establishing 120 hours of lost employee time. "We just estimated what we thought they spent on those problems." [Zerbo Dep., p. 47.] He further testified that he did not know whether the employees were required to work over and above their regular shifts to deal with issues arising as a result of the water

17

leak or whether or not their regular shift time was affected by the leak.  *Id.* at 46-47.

Because Plaintiff has failed to demonstrate a reasonable basis for its claimed damages for lost employee time, Defendant's motion for summary judgment on this element of damages will be granted.

Summary Judgment will also be granted to Defendant on Plaintiff's claim of damages for 150 hours of lost principal's time.  It is well-settled in Michigan law that, because the purpose of compensatory damages is to make the injured party whole for the losses actually suffered, the amount of recovery for such damages is inherently limited by the amount of the actual loss.  *McCauley v. General Motors Corp*., 457 Mich. 513, 520, 578, N.W. 2d 282, 285 (1998); *Stillson v. Gibbs*. 53 Mich. 280, 284, 18 N.W. 815 (1884). Here, Plaintiff's expert, John Zerbo, categorically testified that no loss was actually incurred for lost employee time or for Mr. Yatooma's "lost principal time."  [Zerbo Dep., p. 61.]  Therefore, Plaintiff may not recover damages for "lost principal time."[3]

3.     Lost Future Profits

Lastly, Defendant seeks summary judgment on Plaintiff's claims for lost future profits because they are based on nothing more than speculation and conjecture.

Plaintiff claims that because of the water leak, it not only suffered a loss of business during the damage period, April through August 2013 -- which Defendant does

---

[3]  Because the Court grants Defendant summary judgment on the ground that "no actual loss" for lost principal time was incurred by Plaintiff, the Court need not address Defendant's argument that in this category of damages Plaintiff inappropriately seeks recovery of attorney's fees.

not dispute -- but also it is entitled to "future lost profits" for the ensuing five-year period. Plaintiff's expert, John Zerbo, however, testified that he has know way of knowing if someone would not buy a mattress in 2014 to 2019 because of water on the floor of the showroom in 2013.  [Zerbo, 3/13/15 Dep., p. 61.]  Instead, Zerbo developed a "formula" to demonstrate lost future income based upon the actual number of customers lost during the damage period -- 35 -- and the historical percentage of repeat/referral customers of the four Mattress Closeout businesses  (15.2%)  [Zerbo 3/10/15 Dep., pp. 61-62.]  Using this formula, Zerbo concluded that MCC would lose 5 repeat customers it would have otherwise had but for the water leak issue. *Id.*  Then, Zerbo totaled the sales for the Rochester Hills store in the three months in 2013 prior to the damage period and divided it by the total number of customers for that period and arrived at an average transaction value amount of $769.37.  *Id.* at 68-69.  He then multiplied that average transaction value by 5 (the calculated number of lost customers) and arrived at a future income loss figure for 2014.  *Id*.  He continued on with 2015 through 2019, each year compounding the number of lost customers (e.g., for 2015, 35 plus 5 = 40, times 15.2 yields 6 lost customers), and multiplying that number times the average transaction value. *Id.*

However, Zerbo admitted when asked how he could be sure if there were actually 6 fewer customers in 2014, "I mean there is no way of actually knowing that."  *Id*. at 73. He admitted his was just a "theory."  Furthermore, multiple times during his deposition, Mr. Zerbo admitted that there was no way to know if a customer in the future would not

pay a higher price, or not refer a friend, or would not be a repeat customer because of the condition of the Rochester Hills showroom in April-August 2013.  *Id.*  Indeed, when asked how he could verify that Plaintiff would have 6 fewer customers in 2014 due to the water leak, Zerbo testified, "I mean, there is no way of actually knowing that."  *Id.*

In *Bonelli v. Volkswagen of America, Inc*., 166 Mich. App. 483, 511, 421 N.W.2d 213 (1988), the Michigan Court of Appeals held that damages for lost future profits are completely barred, not if the value is uncertain, but rather if the actual existence of the alleged future damages is speculative.  *Id.*  That is precisely what is presented here. There is simply no way to know whether there will be any loss of future profits in the form of decreased sales or lost customers due the negligence/nuisance alleged to have occurred at MCC's Rochester Hills store in 2013.  Plaintiff cannot show lost future profits beyond speculation.

Furthermore, Plaintiff's basis for computing its "formula" for its projection of future lost sales is questionable.  As indicated, Plaintiff uses figures based on repeat/referral customers of *all* of the MCC outlets -- not just the one Rochester Hills store that suffered the damage due to the water leak.  Plaintiff's expert admitted that he did not know whether the 15.2% repeat/referral rate used in his formula accurately reflects repeat/referrals at Rochester Hills alone.  *Id*. at 65.

> Q:     . . . [W]e can't tell who those referrals which store's is which, correct?
>
> A:     No, we can't.

Q:     Okay.  Is it possible that more repeat or referrals that are indicated there, the raw number, are related to Bloomfield Hills which has nearly double the sales of Rochester Hills?

A:     It's possible.

Q:     And . . . the same would hold true for repeat and referral sales, may be less for Wixom which has about half the sales of Rochester Hills, correct?

A:     It's possible.

Q:     Okay.  Is it also possible they could all be from Wixom, the lowest store?

A:     They could all be from Rochester Hills.

Q:     Right.  You just don't know?

A:     Don't know.

*Id.* at 67.

While mathematical precision in the calculation of damages is not required, there must, at a minimum, be a reasonable basis for computation.  *Ensink supra*, 262 Mich. App. at 524-25.

Based upon the foregoing, the Court find Plaintiff's claim of lost future profits speculative, at best.  Therefore, the Court will grant Defendant summary judgment on this claim, as well.

<u>CONCLUSION</u>

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment as to

21

Liability **[Dkt. # 32]**, is GRANTED IN PART, AND DENIED, IN PART.  Plaintiff's

Motion is granted with respect to Plaintiff's claims of ordinary negligence and nuisance

but denied with respect to any claim for "gross negligence" or "willful or wanton

misconduct."

IT IS FURTHER ORDERED that Defendant's Motion for Partial Summary

Judgment as to Plaintiff's claims for exemplary damages, damages for lost employee

time, for lost principal's time, and for future lost profits **[Dkt. # 36]** is GRANTED.

Therefore, in accordance with the rulings set forth in this Opinion and Order, this

case will proceed to trial only on the issue of Plaintiff Mattress Closeout Center's

recovery of damages for ordinary negligence and nuisance sustained by Plaintiff from

April 2013 through August 2013.

s/Gerald E. Rosen_____
United States District Judge

Dated:  July 15, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on July 15, 2016, by electronic and/or ordinary mail.

s/Julie Owens_____
Case Manager, (313) 234-5135